1   **HALEY GUILIANO LLP**
    JOSHUA V. VAN HOVEN (CSB No. 262815)
2       E-Mail: joshua.vanhoven@hglaw.com
    WILLIAM J. ULRICH (CSB No. 323117)
3       E-Mail: william.ulrich@hglaw.com
    111 N Market Street, Suite 900
4   San Jose, California 95113
    Telephone: 669.213.1050
5   Facsimile: 669.500.7375
    RICHARD T. MCCAULLEY  (admitted *pro hac vice*)
6       E-Mail: richard.mccaulley@hglaw.com
    8 E. Huron, 1004
7   Chicago, Illinois 60661
    Telephone: 312.330.8105
8
    **INTELINK LAW GROUP, P.C.**
9   LISBETH B. MERRILL (CSB No. 201822)
        E-Mail: lmerill@intelinklaw.com
10  23 Corporate Plaza Drive, Suite 150
    Newport Beach, CA 92660
11  Telephone: 949.401.7220
    Facsimile: 949.899.6006
12
    Attorneys for Plaintiff
13  Weiss Residential Research LLC

14              UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 16  WEISS RESIDENTIAL RESEARCH LLC, a Delaware Limited Liability Company | Case No. 8:20-cv-00861-MCS-DFM |
| 17 | Hon. Mark C. Scarsi |
| 18                  Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| 19          vs. | |
| 20 | |
| 21  EXPERIAN INFORMATION SOLUTIONS, INC., an Ohio Corporation, and EXPERIAN SERVICES CORP., a Delaware Corporation | |
| 22 | |
| 23 | |
| 24 | |
| 25                  Defendants. | |

26

27

## Table of Contents

Cases ................................................................................................................. iii

Statutes .............................................................................................................. iii

I.     INTRODUCTION .................................................................................1

II.    FACTUAL BACKGROUND.................................................................1

A.     Experian Launches its Mortgage Team in 2018....................................1

B.     Weiss Analytics' Property-Specific Data and Analytics........................2

C.     Experian Brings in WA And Works Exclusively With WA Through
November 2019 ......................................................................................3

1.   The DLSA and Initial Product Exploration ................................3

2.   Amendments 3 and 4 to the DLSA – Initial CECL and Sandbox
Development, Data Sharing with Oliver Wyman, and Experian
Misrepresentations to Gain Access to WA IP.................................5

3.   Experian and WA Negotiate and Sign the Commercial Agreement, While
Experian Continues its Misrepresentations....................................8

4.   Experian's Sham CECL Product Amendment and Acknowledged
Contractual Breaches ......................................................................10

5.   Experian's Pretextual Sandbox Product Amendment And Premature
Shutdown of WA Relationship ........................................................13

6.   Experian Documents the (Nearly Complete) CECL and Sandbox Product
Development ....................................................................................15

D.     Experian Brings in WA's Direct Competitor, Provides it with WA IP,
and Continues Work Where WA Left Off..............................................15

E.     Experian's Own Projections Predict Substantial Financial Success for
Both CECL and Sandbox ......................................................................16

III.   LEGAL STANDARD ............................................................................17

HG Haley · Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

i

IV.   **ARGUMENT** ..................................................................................18

A.   **WA Has Established Actual Damages** ...................................18

1.   WA Did Not Waive Lost Profits Damages ................................18

2.   Experian's Revenue Share Obligations Survived Termination .................18

3.   Experian Set the Value of the Trade Secrets ..............................19

B.   **WA Has Established Misappropriation of Trade Secrets** ....................20

1.   WA Has Established Existence of Trade Secrets ......................................20

2.   WA Has Established Fraudulent Misappropriation of its Trade Secrets ...25

3.   WA Has Established Reliance on Experian's Fraudulent Misrepresentations ...........................................................27

C.   **Experian Breached the Parties' Agreements** ........................28

1.   The Grant of Access to Oliver Wyman was Conditional ..........................28

2.   Experian Commercialized Products that Use Weiss IP .............................28

3.   Experian Breached the Commercial Agreement in Cutting Off Access to Sandbox .......................................................29

HG Haley ▪ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

Cases

*Anderson*, 477 U.S. at 255 ........................................................................18

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986 ...................................18

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011 ...............................................................18

Fed. R. Civ. P. 56(a); *Albino v. Baca* ("Albino II"), 747 F.3d 1162, 1169 (9th Cir. 2014 .......................................................................... 17, 18

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000 18

Statutes

*supra* at §§ II(C)(2)-(3 .............................................................................18

H̲G̲ Haley ▪ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

iii

## I.    INTRODUCTION

Experian attempted to avoid its contractual obligations to Weiss Analytics ("WA") and misappropriate trade secrets based on too clever tactics and misrepresentations.  While its present Motion relies largely on self-serving testimony of financially interested corporate employees, the contemporaneous evidence tells a different story.  For nearly a year, Experian developed its CECL Mortgage and Sandbox property data integration products while ███████████ with WA property data, analytics, and resources, and based on substantial assistance and contributions from WA.  As evidenced by statements of its top executives in charge of these projects, Experian knowingly breached its agreements with WA to gain continued access to WA trade secrets, and once the products were developed and documented, gave transparently pretextual reasons to spurn WA for a direct competitor while continuing to use WA trade secrets.

## II.    FACTUAL BACKGROUND

### A.    Experian Launches its Mortgage Team in 2018

Experian's traditional business involves the collection, processing, and packaging of consumer credit information.  (AMF 1).  In other words, *Experian's expertise is in consumer-centric information for millions of individuals.*  (AMF 2).  Over the last few years, it has begun efforts to expand that business into other areas.  (AMF 3).  One such expansion was the 2017 launch of the Experian Ascend Analytical Sandbox, a tool sold to institutions to analyze depersonalized consumer credit data.  (AMF 4).  Another expansion was the 2018 launch of Experian Mortgage, an Experian team focused on the mortgage market.  (AMF 5).  As part of its traditional consumer credit business, Experian had information about individual consumers' mortgages.  (AMF 6).  It did not, however, have property data or analytics, i.e., information about the underlying properties such as detailed

HG Haley · Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

1

characteristics and how much the property backing a mortgage is worth.  (SDF 2). Nor did the members of the Experian mortgage team ███████████████ ████████████████████████████████████████████. (AMF 7).  Indeed, the Experian Mortgage group did not bring in an industry veteran (Susan Allen) until ███████████, and was not assigned any technical resources (Upavan Gupta) ███████████████████. (AMF 8, 9). Until then, Experian Mortgage received technical support from employees from ████████████████, who often had ██████████████████████████ ████████████████████.[1]  (AMF 10).

### B.    Weiss Analytics' Property-Specific Data and Analytics

WA is a property data and analytics firm founded by Allan Weiss, a luminary in the field going back to his original work at Case Schiller Weiss.  (Dkt. 43 at ¶¶ 5-7).  He founded WA after the 2008 housing crisis to provide granular analytics such as house-specific valuations and indexes on over 90 million residential properties (vs. traditional ZIP or metro area analytics) that better identify and predict trends.  (Dkt. 43 at ¶ 8).  Although aspects of the underlying data come from third parties that gather publicly available information, complex cleaning, filtering, and data processing operations are required to combine the prepare house-specific data, and further complex statistical and machine learning techniques are employed to develop valuations from that data.[2]  (AMF 11). The result is not only house-specific valuations, but detailed house-specific information about the physical property, property owners, types of loans, and a variety of other information.  (AMF 12).  In other words, *WA's expertise is in property-centric information for millions of residential properties.*  (AMF 13).

---

[1] These other groups also had limited experience with property valuation data and analytics, citing to ████████████████████████.  (SDF 2, 5).

[2] Thus, unlike the employees and executive leadership of the Experian Mortgage group, Allan Weiss and WA's employees have extensive experience and appropriate degrees in computer science, mathematics, data analytics, and distributed computing.  (AMF 14).

**H⋅G Haley ▪ Guiliano**
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

2

OPPOSITION TO MOTION FOR SJ

**C.    Experian Brings in WA And Works Exclusively With WA Through November 2019**

Lacking experience in property data and analytics, the Experian Mortgage group ██████████████████████████. (SDF 2; AMF 15).  Although Experian's Mortgage group had discussions with ████████ ████████████████████████████████, it never worked ███████ ██████ and only began working with ████████████████████. (AMF 16).  In other words, from its formation through the end of 2019, the only property data and analytics firm that Experian ██████████████████████ ████████████. (AMF 119).

1.    The DLSA and Initial Product Exploration

From the beginning of the relationship, Experian Mortgage recognized Allan Weiss's ████████████ (AMF 17).  Because of the superiority of its more granular data and analytics, WA was Experian's preferred partner ████████████. (SDF 21).  After some initial meetings and the signing of an NDA, the parties decided to explore product opportunities combining Experian's consumer-centric data and analytics with WA's property-centric data and analytics.  (AMF 18).

Consistent with this purpose, the parties entered into the Data License and Services Agreement ("DLSA") in October of 2018.  (SDF 12).  The DLSA had an initial term of only 6 months, *i.e.*, through April 3, 2018.  DLSA (Def's Ex. 23) at § 3.1.  The DLSA included strict use, non-disclosure, and reverse engineering restrictions.  *E.g.*, *id.* at §§ 1.2, 1.3, 1.4.  The DLSA describes "Data" (*e.g.*, *id..* at §§ 1, 2.6, 5, Ex. A), "Services" (*e.g.*, *id.* at §§ 2.1, 2.6, Ex. A), and "Deliverables" (*e.g.*, *id.* at §§ 2.7, 11.4)  Exhibit A laid out the specifics of what WA would provide Experian under the DLSA, including detailed sections for "Data" (*id.* at

Haley ▪ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

3

OPPOSITION TO MOTION FOR SJ

Ex. A, § 1) and "Services" (*id.* at Ex. A, § 1), but did not include any "Deliverables" (*id.* at Ex. A).

At this stage of the parties' relationship, the parties were merely exploring potential product collaborations. (AMF 19). Accordingly, the specific "Services" to be provided by WA under the DLSA were limited to "exploration and planning of potential operations and product offerings in connection with, or derived from, the Data (the "Purpose") and analyzing, manipulating and processing the Data." *Id.* at Ex. A, § 2. Experian's license was expressly limited to "***internal*** testing and product development purposes." *Id.* at § 1.2.

While working under the DLSA, ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████. *Id.* at Ex. 2; (AMF 20). By April and May of 2019, Experian and WA had recently begun efforts ████████ ████████████████████████████████████████████████████████ ████████████████████████.[3] (AMF 21).

The DLSA was initially extended twice in early Spring of 2019. In accordance with WA "Services" under the DLSA, WA and Experian engaged in numerous discussions about ████████████████████████████████████ ████████████████████████████████. (AMF 23). This culminated in a presentation and attendance by WA's Allan Weiss in May of 2019 at Experian's showcase Vision conference. (AMF 24). In addition to connecting with a number of potential joint customers, Mr. Weiss met with ████████████████████ ████████████████████. (AMF 25). By May of 2019, at least two product

---

[3] Experian also attempted to provide WA with ████████████████████████ ████████████████████. (AMF 22). However, due to Experian ████████████████████ ████████████████ WA did not ████████████████████████████████████████████ ████████. *Id.*

[4] CECL stands for Current Expected Credit Loss, and is an accounting standard that requires financial institutions to recognize the present likelihood of future

HG Haley · Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

1   opportunities had become apparent: (1) ███████████████████

2   ████████████████████████████████████ (AMF 26); and (2)

3   integration of WA property-centric data into ███████████████

4   ████████████████████████████████ (AMF 27).

5          2.   Amendments 3 and 4 to the DLSA – Initial CECL and Sandbox

6               Development, Data Sharing with Oliver Wyman, and Experian

7               Misrepresentations to Gain Access to WA IP

8          Recognizing that the parties' were beginning to progress from a

9   product exploration stage to a product development stage, Allan Weiss of WA

10  began to demand ██████████████████████████████████████.

11  (AMF 28).  Accordingly, ████████████████████████████████

12  ███████████████████████████████████████████████

13  ██████████████████████████████. (AMF 29).  The CECL Mortgage

14  product would also be developed with Oliver Wyman.  (AMF 30).  While these

15  contractual discussions were ongoing, Experian sought to extend the DLSA a third

16  time.  3rd Amdt. (Def's Ex. 44).  As development work was beginning, the May 29

17  Third Amendment to the DLSA made clear that:

18          For the avoidance of doubt, all fees paid under this Agreement for the

19          additional thirty (30) days of Services performed by WA from June 2,

20          2019 through June 30, 2019 will be for Services.  **No** Data or

21          **Deliverables will be provided to Experian**.  (*Id.*) (emphasis added).

22

23

24          During those contractual discussions, Experian consistently told WA that it

25  would ████████████████████████████████████████

26  _____

27  losses on loans, including unsecured loans such as credit cards and personal loans
    and secured loans such as auto and mortgage loans.



Haley▪Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

1   ███████████ (AMF 31) and repeatedly assured WA that it would ████████

2   ████████████████████████████████.5  (AMF 32).

3   Experian did so with full knowledge – including by top executives6 – that ████

4   ███████████████████████████████████ (AMF 33) and

5   that ███████████████████████████. (AMF 32).

6   Under the Third Amendment to the DLSA, only Experian could access the

7   WA property data.  3rd Amdt (Def's Ex. 44).  But Experian and Oliver Wyman

8   ████████████████████████████████████████

9   ████████████████. (AMF 34).  Accordingly, in the days after the

10  signing of the Third Amendment, ████████████████████████

11  ████████████████████████████████████████

12  ████████████. (AMF 35).  This pressure campaign included Experian

13  ████████████████████████████████████████

14  ████████████████████.7  (AMF 36).  Again, Experian

15  knew at the time it █████████████████████ (AMF 38, 32, 39,

16  40) and that ███████ (SDF 16; AMF 41).  Experian nonetheless submitted to WA the 4th

17  

18  Amendment barely a week after signing the Third Amendment, agreeing that:

19      Experian may give Oliver Wyman access to a version of Experian

20      Analytical Sandbox™ that allows the calculation of statistics *for the*

21      *purpose of developing **but not delivering** a mortgage CECL solution*,

22  _____
    5 These representations were provided by the Experian employee whose job it was

23  to manage the Experian-WA relationship. (SDF 80).

24  6 For example, ████████████████████████████████████

25  ████████████████. (AMF 38).  These same subordinates nonetheless

    told WA ████████████████ (AMF 32, 40)

26  7 WA had been developing its own CECL Mortgage Analytics.  (SDF 69).  Based

    on Experian's commitment to use "WA's suite of CECL analytics in a mortgage

27  CECL solution" and ongoing contractual discussions, WA focused its internal

    efforts on supporting joint product development with Experian.  (AMF 42).

Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

6

using both Experian consumer credit data and WA Data, such that Experian prevents removal or download of the WA Data in Experian Analytical Sandbox™. *Such permission is provided in contemplation of finalizing the commercial agreement **with terms governing use of WA's suite of CECL analytics in a mortgage CECL solution***.[8]  (4th Amdt., § 1) (emphasis added).

Beginning with the 3rd and 4th Amendments, and based on the terms and commitments of those documents, WA committed substantial resources to CECL Mortgage and Sandbox product development.  (AMF 42).  WA provided its full – trade secret protected – data set to both Experian and Oliver Wyman.  (AMF 43). Updated complete WA property data sets were also provided to Experian during this time period.  (AMF 44).  WA engaged in numerous meetings and substantial correspondence with Experian where it explained in detail how its property-centric data was created and worked – where it came from, what fields were potentially available, what they represented, what the underlying data limitations were, and how it could be modified and used.  (SDF 65).  This included demonstrating that ███████████████████████████████████████████████████████████████ ██████████ (AMF 45), thus providing a potential solution ███████████████████████████ (AMF 46). Through this interactive process, WA ███████████████████████████████

─────────────────────────────

[8] Experian was in constant communication ██████████████████████████ ███████████████████. (AMF 48).


Haley ▪ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

3.    Experian and WA Negotiate and Sign the Commercial Agreement, While Experian Continues its Misrepresentations

After the Fourth Amendment was signed, WA continued to push for the signing of a definitive Commercial Agreement.  (AMF 54).  Although the parties agreed to a "Product Amendment" structure under which terms for particular products would be finalized, Experian continued to ████████ ████████████████████████████████████████████████████ █████.  (AMF 32, 40, 31).  Experian did so despite ███████ ███████████████████████████████████████████████████ █ ███████████████████████ (SDF 16; AMF 41), and █████████ ███████████████████████████████████████████ (AMF 32). Regarding the former, █████████████████████████████.  (AMF 41).  Regarding the latter, ██████████████████████████████████████████ ██████████.  (AMF 32).

Among the key issues that WA and Experian were negotiating for the Commercial

**9    EXCLUSIVITY**

9.1    Unless agreed to in a product amendment with respect to a particular product, there will be no exclusivity between the Parties in connection with the Agreement.

In the final Commercial Agreement, this disclaimer was replaced with a right of first refusal (in bold below) and a strict prohibition on any use of the other party's IP  (underlined below):

Unless agreed to in a Product Amendment with respect to a particular product there will be no exclusivity obligation by a Party to the other Party in connection with the Agreement. Notwithstanding the foregoing, in the event a product idea that relies on both credit data and WA Data Assets ("Product Idea") does not materialize into an

HG Haley · Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

8

OPPOSITION TO MOTION FOR SJ

executed Product Amendment and a Party wants to pursue the development and commercialization of such Product Idea, **such Party shall first propose to the other Party the Product Idea under terms commensurate with the contributions, royalties and development of such Product Idea** based on similar other Product Amendments and provide the other Party an opportunity to determine whether to enter into a Product Amendment for such Product Idea under the proposed terms. **Such Party shall have 30 days from receipt of notification to determine and notify the requesting Party whether it will accept the Product Amendment with the requesting Party or allow the requesting Party to pursue development and commercialization of such product outside of this Agreement**, provided that in such instance, *the requesting Party shall not use the non-Requesting Party's Intellectual Property in the development and commercialization of such product*. (Def's Ex. 52 at § 9, WA0036602).

A proposed Product Amendment must be commensurate with the "contributions" of the receiving party. *Id.* at § 9. Com. Agmt. § 9. "Contributions" are defined in the context of joint IP, and broadly include "products, technology, data and resources . . . ." *Id.* at § 6.6(c); *see also* AMF 56, 57, 58, 59 (Experian describing each of products, technology, data and resources).

Even if a party does comply with the right of first refusal, Section 9's strict prohibition on use of the other party's IP is unequivocal: "the requesting Party shall not use the non-Requesting Party's Intellectual Property in the development and commercialization of such product." (Com. Agmt, Def's Ex. 52 at § 9). And as noted above, a party is entitled to a share of IP ownership based on contribution of any of products, technology, data, and resources" used in development of "New

Haley Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

9

OPPOSITION TO MOTION FOR SJ

Solutions." (*Id.* at § 6.6.(c)).  New Solutions is broadly defined to include "any new data, products, services, applications, analytics, tools, or Intellectual Property, as well as any associated output or by-products generated as a result of or created under this Agreement." (*Id.* at § 6.6.(b)).  These definitions were negotiated, and were ███████████████████████████████████. (AMF 55).

The Commercial Agreement was signed on July 31, 2019. ██████████████, Experian hired ████████████████████████████████████. (AMF 9).  Also, in late July 2019, ██████████████, a key technical resource for Experian, finally ██████████████████████████████ ████████. (AMF 60).  Prior to either of ████████████ becoming involved in the project, ██████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████. (AMF 62-64).

4.   Experian's Sham CECL Product Amendment and Acknowledged Contractual Breaches

WA's substantial assistance with Sandbox mortgage integration and CECL Mortgage development continued after the Commercial Agreement was signed, including ████████████████████████████████████████████████ ██████████████████████████████████████. (AMF 65).  In addition, after ██████████████████████████████████████ (AMF 68), and because WA's personnel ████████████████████████████████████████████████

⁹ The ████████████████████████████████████████████ ████████. (AMF 66).  Once matched, ██████████████████████████████. (AMF 67).



1   ███████████ (AMF 69), WA matched and validated ███████████

2   ███████████ (AMF 70).

3         While WA was focused on developing products and complying with its

4   contractual obligations, Experian was attempting to take advantage of WA's good

5   faith performance.  While the Commercial Agreement was still being negotiated –

6   and despite the Fourth Amendment's prohibition on "delivering" a CECL

7   Mortgage module and the Commercial Agreement's prohibition on

8   "commercialization" without a Product Amendment – Experian's mortgage group

9   ███████████.

10   (AMF 71).  That "launch" occurred on August 7, barely a week after the

11   Commercial Agreement was signed, and with no mention of WA.  (AMF 72).

12         Mere days before sending a CECL Mortgage Product Amendment to WA on

13   August 22, ███████████

14   ███████████

15   ███████████

16   ███████████ (AMF 74, 75)), *i.e.*, excluding

17   ███████████

18   ███████████ (AMF 76)).  (AMF 73).  Experian's lead executive on the project,

19   ███████████

20   ███████████ before the Fourth Amendment and Commercial Agreement were signed.

21   (AMF 38).  This plan was communicated at the time to ███████████

22   ███████████.  (AMF 32, 38, 39, 40, 77, 78).  In this

23   way, Experian could ███████████

24   ███████████ while de facto ███████████.  (AMF 77, 78).

25   This ███████████

26   ███████████

27   ███████████.  (AMF 79).


111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

Even more egregiously, the August 22 proposed CECL Mortgage Product Amendment ███████████████████████████████████████████ ██████ (CECL Prod. Amdt., Def's Ex. 64, at § 7(a)). This was proposed in spite of the clear terms of the WA-Experian Commercial Agreement, that joint IP would be based on contributions of "products, technology, data and resources" to "any new data, products, services, applications, analytics, tools, or Intellectual Property, as well as any associated output or by-products generated as a result of or created under this Agreement." (Com. Agmt., Def's Ex. 52, at §§ 6.6(b), (c)). Indeed, the proposed Product Admits its allocation of IP ownership is "[n]otwithstanding anything to the contrary in Section 6 (Intellectual Property) of the Agreement . . . ." (CECL Prod. Amdt., Def's Ex. 64, at § 7(a)). Throughout the entire time that Experian made its contractual commitments of the Fourth Amendment and Commercial Agreement and related statements, it ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████. (AMF 33). It also knew ████████████████████ ████████████████. (AMF 80). Yet the first time WA ████████████████████████████████████████████████. (AMF 81).

WA – shocked at Experian's egregious treatment of a business partner – immediately explained that █████████████████████████████████████ ████████████████████████████████████████████████████████" of WA to CECL Mortgage. (AMF 82). Instead of discussing these issues with WA in good faith, █████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ (AMF 83). Although Experian





(AMF 84),

. (AMF 85).

explained that:

. (AMF 87).  Experian also began

. (AMF 88, 89). Before Oliver Wyman

. (SDF 48, 49, 68, 73, 89, 100, 102, 103, 105).  Indeed,

. *Id.*

5.     Experian's Pretextual Sandbox Product Amendment And Premature Shutdown of WA Relationship

Despite its concerns about Experian's conduct related to the CECL Mortgage Product Amendment, WA continued to provide technical information and produce data loads for Sandbox property data integration through September and October.  (AMF 90).    Unbeknownst to WA, Experian continued its discussions with WA's direct competitor Collateral Analytics during this time. (AMF 91).  Also unbeknownst to WA – and at a time when Experian only had

Haley ▪ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

13

access to WA data and resources – Experian's Upavan Gupta began documenting
Experian's learnings regarding "Property Data Pinning" and "Time Series Data
Analysis." (AMF 92, 93).

WA and Experian were negotiating a Product Amendment for Sandbox property
data integration during this time. WA agreed to the terms of a draft sent by
Experian. (AMF 94). After WA agreed, Experian made substantial changes to the
draft, adding non-exclusivity language that Experian knew would be problematic
to WA and disclaiming the obligation to provide WA data even when requested by
customers. (AMF 95, 96). WA expressed its concerns, but attempted to continue
negotiations on the Sandbox Product Amendment. The head of the Experian
Mortgage group made a pretextual decision to stop working with WA on
November 6, 2019, while these discussions were ongoing and less than two days
after submitting a proposed Sandbox Product Amendment to WA. (AMF 97, 98).
This pretextual decision did not consider the ongoing negotiations, but instead
declared "let's work on getting out of the whole thing then." (AMF 99).

And that's exactly what Experian did. Despite Susan Allen advising that "[i]t
couldn't hurt to hear what Allan has to say[,]" Experian cancelled meetings to
discuss the Sandbox Product Amendment and cut off WA's Sandbox access.
(AMF 100, 101; SDF 45). The only remaining discussions between Experian and
WA related to Experian's attempts to terminate the agreement before its natural
expiration. (AMF 102). Also, during this time period and unbeknownst to WA,
Experian ended the "pause" of CECL Mortgage development in late October to
early November. (AMF 103; SDF 51). Experian never told WA that it restarted
CECL Mortgage development. (AMF 104).

Haley ▪ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

14

OPPOSITION TO MOTION FOR SJ

6.      Experian Documents the (Nearly Complete) CECL and
Sandbox Product Development

While Experian may have prematurely ended the WA working relationship with 8+ months left under the term of the Commercial Agreement in early November, it did not stop ████████████████████████. In a

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ (AMF 92).  In "████████████████████████████

████████████ *Id*.  This document ████████████████████████████

████████████████████████████. *Id*.  While Experian

████████████████████████████████████████████████████████████████

. *Id*.  Experian admits that ████████████████████████████████████

████████████████████████████. (AMF 105).  Experian also admits that

████████████████████████████████████████████████████████████████

████████████████████████████. (AMF 93).

**D.      Experian Brings in WA's Direct Competitor, Provides it with WA
IP, and Continues Work Where WA Left Off**

Concurrent with its pretextual decision to stop working with WA, Experian ████████████████████████████████████████████████████████████████

████████████████████████. (AMF 106).


Haley ▪ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

15

OPPOSITION TO MOTION FOR SJ

1

2  ███. (AMF 51).

3  ████████████████████████████████████████████.

4  (AMF 52).

5  ███████████████████. (AMF 107).

6  ██████████████████████████████████████. (AMF

7  108).  Indeed, using the processes developed with WA, ████████████

8  ████████████████████████████████████████[10]

9  (AMF 109).

10

11

12      **E.**     **Experian's Own Projections Predict Substantial Financial Success**

13           **for Both CECL and Sandbox**

14           CECL is a federal regulatory requirement, and for ██████████

15  ██████████████████████, the compliance date for CECL has

16  been delayed to 2023.  (SDF 62; AMF 111, 112, 113).  Experian believes that

17  ████████████████████████████████████████████. (SDF 62;

18  AMF 113).  According to Experian's own projections, ████████████

19  ████████████████████████████████████████████

20  ████[11]  (SDF 62, 63; AMF 114).

21  _____

22  [10] Starting in late 2020, Experian began ████████████████████

23  ███████████████████. (SDF 7).  Notably, ████████████. (SDF 6).

24  The logic ████████████████████████████████████. (SDF 6). That

25  using ████████████████████████████████. (SDF 6).  Even

26  ████████████, Experian did not ██████████████████████████████.

   (AMF 110).

27  [11] An earlier projection ████████████████████████████████████.

   (AMF 118).

H-G  Haley ▪ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

1    Experian has already █████████████████████████████████

2    ███████████████████████. (AMF 115).  Experian also █████████████████

3    ████████████████████████████████████. (AMF 116).  Experian has

4    ██████████████████████████████████████████████

5    ██████████████████. (AMF 117).

## III.    LEGAL STANDARD

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca* ("Albino II"), 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc) ("If there is a genuine dispute about material facts, summary judgment will not be granted.").  A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). To meet its burden, "[t]he moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).   In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011)  It need only draw inferences, however, where there is "evidence in the record ... from which a reasonable inference ... may

H|G **Haley** ■ **Guiliano**
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

17

be drawn." *Celotex*, 477 U.S. at 330 n. 2 (citation omitted). Additionally, "[t]he evidence of the non-movant is to be believed . . . ." *Anderson*, 477 U.S. at 255.

## IV.  ARGUMENT

### A.  **WA Has Established Actual Damages**

WA is entitled to damages, including lost profits, for breach of contract and misappropriation of trade secrets, and those damages have not been waived. The amount of lost profits at issue is not at all speculative, as they are based on "contributions" the parties negotiated in the Commercial Agreement, on statements and Product Amendments proposed by Experian., and on Experian projections.

#### 1.   WA Did Not Waive Lost Profits Damages

WA did not waive lost profit damages.  As discussed in detail herein, Experian made multiple misrepresentations to WA in order to gain access to WA trade secrets and know-how (*supra* at §§ II(C)(2)-(3)), engaged in continued fraudulent conduct with sham product amendments (*supra* at §§ II(C)(4)-(5)), all while documenting joint IP (*supra* at §§ II(C)(6)), to provide to a direct WA competitor (*supra* at § II(D)).   Experian cites to the Commercial Agreement, §13.1, to argue that WA waived any right to seek lost profits damages in this matter.  However, §13.3 of the Commercial Agreement specifically provides that "[t]he limitations in Section 13.1 and 13.2 shall not apply to Experian's fraudulent misrepresentations or actions." (Def's Ex. 52 at § 13.3).  Under the facts of this case and the Commercial Agreement, the limitations of §13.1 simply do not apply.

#### 2.   Experian's Revenue Share Obligations Survived Termination

While the Commercial Agreement was terminable, and had an expiration date, certain provisions of the CA survived any termination. (Def's Ex. 52 at §

**H|G** Haley ▪ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

18

OPPOSITION TO MOTION FOR SJ

18.7).  These include both § 9 (Exclusivity) and § 6 (IP, including §§ 6.6(b) and

6.6(c)).  Because Experian's sham Product Amendments were not "commensurate"

as required under § 9, those limitations still apply.  *See supra* at §§II(C)(4)-(5).

And even if Experian had not submitted sham Product Amendments, under Section

9 its strictly prohibited from development and commercialization using any WA

IP.  *See supra* at §§II(C)(3).  Under the Commercial Agreement's definition of

joint IP under the §6.6(b)(c) (*see supra* at §§II(C)(3)), Experian has clearly used

WA IP for the development of CECL Mortgage and Sandbox property integration

(*supra* at §§ II(C)(6), § II(D)), despite being prohibited from doing so in

perpetuity.  (Def's Ex. 52 at § 9).

It is nonsensical to suggest that the limitations of § 9 do not survive the

termination of the Commercial Agreement.  WA bargained for the inclusion of § 9

and § 6.6 (IP) in the Commercial Agreement to protect the its contributions.  .

Having breached § 9 (in multiple ways), Experian cannot escape the consequences

of those breaches – by failing to offer commensurate terms, it cannot pursue CECL

Mortgage or Sandbox property integration at all; even if it had not submitted sham

Product Amendments, no WA IP can be used to develop or commercialize these

products.  Having come this far with WA IP,[12] Experian did not and cannot now

"unring" the bell and develop these products independent of what it learned from

WA.  WA is entitled to a revenue share in perpetuity for these products.

3.      Experian Set the Value of the Trade Secrets

Finally, Experian argues that WA's damages positions are too speculative. The

damages by WA are not at all speculative, and are based on the actual projections

---

[12] In taking advantage of the WA products and know-how, Experian essentially
leveraged Allan Weiss's life's work. While this information has been referred to
throughout this case as "data", the information that WA provided was much more
than a compilation of publicly available information.  Experian could have
attempted to develop and commercialize products without WA IP.  Instead, it
documented those products and provided that information to a WA competitor.

**HG** Haley ▪ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

19

of Experian with respect to the technology and products at issue in the case.  *See supra at* § II(E).13  As to WA's share of that revenue, the parties apportioned a value to the trade secrets and know-how provided by WA through their course of dealing ▮▮▮▮.  *See supra at* §§II(C)(2)-(4).  As pointed out by Experian, they paid for the data; but the revenue share was for WA "contributions" of IP.  *See supra at* §§II(C)(3).  As discussed, to the extent that WA's damages are based on misappropriation of the trade secrets offered by WA, those trade secrets form the foundation of Experian's ability to produce a product.  *Supra* at §§ II(C)(6), § II(D)). Each of the trade secrets here serves as a barrier to the ability to produce the product.[14]

## B.   WA Has Established Misappropriation of Trade Secrets

Experian argues that WA cannot establish the existence of a trade secret, that Experian did not fraudulently misappropriate any trade secrets, and that WA cannot establish justifiable reliance.  Experian is wrong on all three issues.

### 1.   WA Has Established Existence of Trade Secrets

Experian's motion recites straw-man characterizations of WA's trade secrets[15] (Dkt. 75-1 at p. 15:19-22, 26-28; and 19:9-10), and then asserts that

---

[13] Experian's reliance on *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714 (5th Cir. 2006) is misplaced. The Court found there that the projections prepared by the defendant were too speculative (which is not surprising given that the defendant in that case characterized his financial projections as a "wild … guess", *Id.* at 720). Here, the financial projections relied on were the projections that Experian, a large company with vast experience launching products, used to make business decisions regarding these products.

[14] Experian's reliance on cases where the plaintiff was pursuing theories of unjust enrichment are not applicable.

[15] With respect to what Experian characterizes as "CECL Methodologies" and other "Applications", ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see* SDF 48, 49, 68, 73, 89,


111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

those characterizations lack specificity to qualify as trade secrets.  Dkt. 75-1 at p. 15-16, 19.  The actual asserted trade secrets are as follows (Def's Ex. 105, ROG2):



100, 102, 103, 105; AMF 51-52, 92, 93, 105)

Haley ▪ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

- ████████████████████████████████████
████████████████████████████████
████████████.

The actual asserted trade secrets[16] – as opposed to Experian's characterizations – are more than specific enough to meet the requirements of specificity. WA agrees that the identification of trade secrets must be more than "ideas and broad conceptualizations" – but it has identified much more than that in this case.

Nor are Experian's other arguments availing.  The primary deficiency with Experian's arguments is that it grossly mischaracterizes what WA provided to Experian.  With respect to the underlying WA data, WA did not merely provide Experian with "outputs," but provided its complete 90-million plus data set under strict confidentiality restrictions.  (AMF 43).  When Oliver Wyman and Experian ██████████████████████████████████████, WA did so successfully with ███ ██████████████████████████████████████████████████ ████████████████████████████████████████.  (AMF 68-70).  And while it did not provide the specific algorithms and code for how the valuations of its data set are created,[17] WA explained in detail how its property-centric data was created and worked (████████████████████████████████████ ████████████████████), as part of the critical exercise of combining property-centric data with consumer-centric data.  (SDF 65, AMF 45-47, AMF 65).  Only by gaining an understanding of the entire WA data set and available fields and methods for matching could either CECL Mortgage or Sandbox have been

---

[16] Where Experian discusses "Plaintiff's own expert," it is referring to a damages expert, not WA's technical expert. *See* Ball Decl. Ex. 99.

[17] Indeed, Experian's "algorithms, code, and software" argument and associated citations are a red herring.  (Dkt. 75-1 at pp. 16-17).  WA is not arguing that Experian recreated its valuations, but rather, that it mined WA for proprietary information as to how its complex data sets are created and operate, jointly developed new processes and data sets, and then documented and provided those findings to a WA competitor.



Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

developed.  *Supra* at § II(C)(2)-(5).  That is why Experian extensively documented these understandings before moving from WA to a competitor.  *Supra* at § II(C)(6). And that's why Experian and Oliver Wyman instructed that competitor how to recreate what WA had already successfully done.  *Supra* at § II(D)

Again, once the information and substantial assistance actually provided by WA is considered, each of Experian's arguments clearly fail.  First, just because WA has competitors does not mean its complete 90-million plus data set, the details of its operation and creation, custom modeling data sets, or matching procedures are matters of general knowledge.[18]  Even the complete data set itself is only provided under strict non-disclosure provisions.  *E.g.*, DLSA (Def's Ex. 23) at §§ 1.2, 1.3, 1.4.  And in any event, WA provided much more, not just "indexes, valuations, and forecasts."  Indeed, if WA's technical contributions were "widely available," why would Experian need to document those contributions and provide them to WA's competitors?

Experian also argues that "Plaintiff freely provides outputs to prospective customers without any confidentiality designations or requirements" and "openly discloses on its website the methodologies and formulas used to produce the data." Dkt. 75-1 at p. 17.  With respect to the former, Experian is referring to WA providing single-home output data on its website, not providing its entire 90-million plus sample data set in various permutations, details about its operation and creation, custom modeling data sets, or matching procedures.[19]  (SDF 9, 66).  With respect to the latter, the descriptions provided on the website are at a high level, and do not include any of these trade secrets in any event.  (SDF 67).

---

[18] Experian's Coca-Cola analogy falls particularly flat.  In the present situation, it is as if Coca-Cola (WA) entered into strict contracts with what it believed to be a trusted business partner (Experian), granted that business partner access to its factory and ingredient list, and then that partner extensively documented its findings and handed them to a Coca-Cola competitor.

[19] Experian does not even attempt to provide an explanation as to how "any person can . . . learn the purported trade secrets" from such limited information.

HG Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

1    Specific to the jointly developed matching procedures, Experian's additional

2    arguments are similarly based on mischaracterization of the underlying facts.

3    Although Experian had experience with consumer credit information, it lacked

4    experience as to property-centric data and data sources, let alone how to combine

5    them with consumer-centric data. *Supra* at § II(A). Accordingly, the vast majority

6    of matching problems were due to Experian's ███████████████████████████████

7    ████████████████████████████████, not issues with WA. *Id.* Indeed,

8    when ████████████████████████████████, Experian and Oliver

9    Wyman instead relied on WA ████████████████████████

10   ████████████████████████. (AMF 68-70).

11   Experian's discussions of ████████████ contributions to the matching logic

12   in fact demonstrates that Experian lacked or failed to provide the technical

13   resources to perform the matching. ████████████████████████

14   ████████████████████████████████████████████████

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████████

17   ████████████████. (AMF 61-64).

18   ████████████████████████████████████ admits that

19   any issues with WA's portion ████████████████." (SDF 37). Once

20   Experian's issues ████████████████████████████

21   ████████████████████████████. (AMF 63-63).

22   And when Experian finally assigned ████████

23   ████████████████████████████████████████████

24   ████████████████████████████████████████.

25   (AMF 9, 92). That documentation ████████████████

26   ████████████████████████████████

27



1   █████████████. (AMF 119). ███████████████████████
2   ████████████████ (AMF 51), and are still ███████████ (SDF 6).

3       2.    <u>WA Has Established Fraudulent Misappropriation of its Trade</u>
4   <u>Secrets</u>

5           Experian's senior executives' contemporaneous statements –
6   and reams of evidence showing their reports implementing their orders –
7   demonstrate that Experian did in fact fraudulently obtain access to WA's trade
8   secrets.  But as an initial matter, Experian's understanding of the parties'
9   agreements is flawed.

10          Experian first argues that "Plaintiff agreed to license its Data and services
11   for product development purposes in exchange for a monthly minimum fee," that
12   Experian "paid an additional $50,000 to allow Oliver Wyman to access Plaintiff's
13   Data to Develop a CECL mortgage model[,]" and that "Experian retained all
14   ownership of deliverables."  As to the DLSA and "deliverables," there were no
15   deliverables in the DLSA and to the extent clarification was helpful, the 3rd
16   Amendment to the DLSA made clear that "No Data or Deliverables will be
17   provided to Experian."  *Supra* at § III(C)(2).  Prior to this time, WA provided its
18   data sets and consulting on potential products—but minimal actual product
19   development such as █████████████████████████████
20   █████████████.  *Supra* at § III(C)(2).  Contrary to Experian's assertions, it
21   simply did not gain ownership over WA trade secrets under the DLSA.

22          As to the purported "$50,000 to allow Oliver Wyman to access Plaintiff's
23   Data to Develop a CECL mortgage model," Experian is incorrect.  The 3rd
24   Amendment – which provided WA $50,000 for data processing – did not grant
25   Oliver Wyman any access to WA data, let alone "to Develop a CECL mortgage
26   model."  *See* 3rd Amdt (Def's Ex. 44) (not granting any access to OW).  Rather,
27   shortly after the 3rd Amendment Oliver Wyman and Experian were desperate to get

**H**|**G** Haley ▪ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

25

1   the WA data to Oliver Wyman, and were allowed to do so only after Experian

2   agreed that Oliver Wyman would not use WA data for "delivering a mortgage

3   CECL solution" and that "[s]uch permission is provided in contemplation of

4   finalizing the commercial agreement with terms governing use of WA's suite of

5   CECL analytics in a mortgage CECL solution." *Supra* at § III(C)(2).

6           The record shows that Experian misrepresented WA's potential revenue

7   share and ownership before the 4th Amendment, in the 4th Amendment, and in

8   negotiations leading up to the Commercial Agreement.  Experian knew ████

9   ████████████████████████████████████████████████, yet it

10  represented that WA ███████████████████

11  ████████████████████████████████████████████

12  ███████████████ "products, technology, data and resources." *Supra* at §§

13  III(C)(2)-(3).  Experian was fully aware ██████████████████

14  ████████████████████████████████████████████

15  ████████████████████████, but never told WA despite

16  ██████████████████████████████████████

17  ██████████.  *Supra* at §§ III(C)(2)-(3).  And the whole time while Experian

18  repeatedly ████████████████████████████████████

19  ████████████████████████████████.  (AMF 32, 38).

20          Experian's misrepresentations were not only inconsistent with what it told

21  WA during negotiations, but they were contrary to the clear terms of the

22  Commercial Agreement.[20]  The promises of the 4th Amendment were consistent

23  with Section 9 of the Commercial Agreement, which was revised to include a right

24  of first refusal and an absolute prohibition on use of WA IP outside the

25  _____

26  [20] Contrary to the cases cited by Experian, here the misrepresentations were
    consistent with the terms of the written agreement. Accordingly the fraud claims
27  are not barred by the existence of the written agreement. *Kentwool Co. v. NetSuite
    Inc.* 2015 U.S. Dist. LEXZIS 19982 (ND Cal. 2015).


**H⊦G** Haley ■ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

Commercial Agreement.  *Supra* at §§ III(C)(2)-(3).  And Experian's promises of ownership and revenue share were consistent with the (negotiated) definition of contributions for purposes of Section 9 and for ownership of IP.  *Supra* at § III(C)(3).  That Experian made these promises and negotiated these contract terms knowing it could not comply is fraud.  It further perpetuated this fraud by submitting sham product amendments.[21]  *Supra* at §§ III(C)(4)-(5).

        3.    <u>WA Has Established Reliance on Experian's Fraudulent Misrepresentations</u>

        Experian's argument on reliance fails because it is based on (1) misstating WA's trade secrets and its disclosure of those trade secrets to Experian; (2) incorrect interpretations of the DLSA, its Amendments, and the Commercial Agreement; and (3) ignoring that Experian's admittedly false statements to WA are consistent with the parties' agreements and conduct.  WA's conduct in vigorously negotiating the parties' agreements – including the explicit exclusion of Deliverables from the 3rd Amendment, the explicit limitations on the circumstances of Oliver Wyman's use of WA data in the 4th Amendment, joint IP ownership based on "products, technology, data and resources," and strong exclusivity protections – and WA's justifiable surprise at Experian's subsequent conduct contrary to those protections, clearly demonstrates its reliance.

---

[21] The willfull blindness cases cited by Experian are not applicable to the facts here. In *Quintara Biosciences, Inc. v. Ruifeng Biztech Inc.*, 2020 WL 6118494 (N.D. Cal. Oct. 16, 2020), the plaintiff stated in the complaint that it "took an unwritten one million dollar loan with significant strings attached from a new business partner in 2013, entered an illusory joint-ownership collaboration agreement shortly thereafter, and in 2017 agreed to a lease name swap, which Plaintiff's own founders suspected to be illicit." In *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025 (9th Cir. 1992), the plaintiff was presented with repeated indications that the financial information he was receiving was grossly inaccurate. There are no similar facts here.

**HG** Haley ▪ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

## C.   Experian Breached the Parties' Agreements

### 1.   The Grant of Access to Oliver Wyman was Conditional

Experian first argues that Experian's grant of access to WA data and confidential materials was proper under the 4th Amendment to the DLSA.  While Experian is correct that the terms of the 4th Amendment granted the right to provide Oliver Wyman access to WA materials, that access was limited and conditional.  *Supra* at § III(C)(2).  But Experian did not comply with those conditions, either as to not delivering a mortgage CECL solution (SDF 101) or to utilizing WA CECL analytics (AMF 41, 80).  Indeed, Experian knew at the time it made those statements that it could not ███████████████████████ (AMF 38, 32, 39, 40) and that Oliver Wyman ████████████████████████████████ ███████████████████████ (SDF 16; AMF 41).  Given that Experian knew that it could not keep its promises to WA with respect to a revenue share, and knowing that Oliver Wyman ████████████████████████████████████████ █████, Experian did not have the right to provide WA data to Oliver Wyman. WA specifically negotiated the inclusion of the language concerning the commercial agreement to ensure that WA analytics would be included.  On this basis alone, Experian's motion for summary judgment should be denied as to the issue of whether Experian properly granted Oliver Wyman access to the WA data under the 4th Amendment to the DLSA.

### 2.   Experian Commercialized Products that Use Weiss IP

Experian next argues that it did not use any WA Intellectual Property in developing the products that it developed with Oliver Wyman. Contrary to the arguments advanced by Experian, WA was heavily involved with Experian in teaching Experian, among other things, how to match consumer credit data with mortgage information. *See supra* at §§ III(C)(2)-(6).  That knowledge is now a key

**HG** Haley · Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

28

1   part of any CECL mortgage module that Experian develops.  *See supra* at §§

2   III(C)(4), (6), III(D).  WA is entitled to present its evidence to the jury – that WA

3   made substantial contributions to Experian's CECL mortgage module.

4        Because any Experian CECL mortgage module will necessarily contain WA

5   IP, Experian cannot sell that product without first proposing a revenue share that

6   recognizes the WA contributions.  While Experian claims that it made such an

7   offer, there is a material issue of fact as to whether or not this "offer" complied

8   with the provisions of Section 9.  *See supra* at § III(C)(4).  Experian glosses over

9   this issue by baldly stating that "Experian proposed Product Amendments to

10  Plaintiff, which were plainly in line with Plaintiff's status as a data provider."  *Id.*

11  WA disputes that the offer complied, and that WA was merely a data provider.  *See*

12  *supra* at §§ III(C)(4), (6), III(D).  The jury is entitled to decide whether or not the

13  proposal made by Experian complied with the terms of Section 9.

14       Experian also argues that its activities with respect to "marketing" a CECL

15  mortgage module do not amount to "commercializing" that product.  Experian

16  argues that "[i]t is undisputed that commercializing means to sell or deliver a

17  product, and that marketing a product before completion is common in the

18  industry."  WA disputes this "undisputed" fact.  (SDF 107).  In any event,

19  Experian technical witnesses personnel admit CECL Mortgage is ████████████

20  ██.  (AMF 113).

21       3.   Experian Breached the Commercial Agreement in Cutting Off

22       Access to Sandbox

23       Finally, WA was entitled to make use of Sandbox to develop new ideas for

24  potential product applications throughout the term of the Commercial Agreement.

25  Experian cut off that access to prevent WA from proposing any further Product

26  Ideas.  (AMF 101).  That unilateral action by Experian deprived WA of the bargain

27  it struck in the Commercial Agreement.  Experian ignores the fact that if WA

HG **Haley ▪ Guiliano**
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ

1  offered a fair Product Amendment to Experian for a new Product Idea that

2  Experian would be able to either (1) accept the Product Idea and the revenue share

3  proposed by WA, or (2) reject the WA Product Amendment.  (Com. Agmt., Def's

4  Ex. 52 at § 9).  In either scenario, proposing a new Product Amendment would be

5  to WA's benefit.  Experian cutoff access to Sandbox to deprive WA of these

6  benefits.

7

8

9  DATED: July 12, 2021                 **HALEY GUILIANO LLP**

10

11                                      By: */s/ Joshua Van Hoven*
                                          JOSHUA V. VAN HOVEN
12

13                                       *Attorneys for Plaintiff*
                                         Weiss Residential Research, LLC
14

15

16

17

18

19

20

21

22

23

24

25

26

27



Haley ▪ Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

OPPOSITION TO MOTION FOR SJ